Okay, Kelsey, you ready to proceed? Yes, Your Honor. Okay, Mr. Seiler or Seiler? It's Seiler. Okay, Mr. Seiler, you want to proceed? Yes, thank you. Good afternoon, Your Honors. I'm Tim Seiler with Carf, Carf & Cerruti, and I represent the appellant, Joseph Canada. I'd like to reserve three minutes for rebuttal. Okay. This case comes entirely down to pretext. Whether a reasonable jury, considering the facts in the light most favorable to Mr. Canada, could determine that the real motive for termination here was retaliation as opposed to Grossi's asserted reason for termination. Is there any issue about whether or not the people at Grassi knew about the discrimination complaint that he had filed, the Title VII complaint that he had filed? I didn't see any issue about that. I don't believe that there's any issue as to whether or not they knew about the protected activities. He did complain directly to Osorio, their human resources manager, who was involved in the decision to terminate. And he'd also previously made complaints to John Grossi about that, because the other individual who was involved in the decision to terminate, and both of them also had knowledge of his formal complaints of discrimination that he filed with the district court. And didn't Grossi even approach him and ask him what's with the complaint? That is true. He did approach him, asked what is going on with this complaint. Actually, I'm sorry. They knew about it. I would agree with you, Your Honor. Yes. When did Grossi approach him? I don't know that we have a specific timeline as to when that occurred. His formal complaint was filed in April of 2019, and it was sometime thereafter that he came up to him and essentially told him that, hey, you know, are you going to withdraw this? When he refused to do so, he was told, we're just going to get other African-American employees to specifically testify against you. That's in the record, that last part of that statement? That is in the record. That's testimony from Mr. Canada. Although Mr. Grossi himself does admit that he did approach Mr. Canada and did ask him what is going on with this, and he admits also that he was upset by the complaint. Okay. So there are obviously two standards to show pretext in these types of cases. The first is directly disputing the legitimate reason for separation or showing evidence that the retaliation was more likely than not the real reason for the separation. Here, there's an abundance of evidence showing that retaliation was the actual true cause of the separation. Most importantly, there's significant evidence of animosity towards Mr. Canada, both directly related to his protected activities and generally immediately following his protected activities through his separation, as well as significant irregularities surrounding his separation from employment, which also heavily indicate a witch hunt performed against Mr. Canada as a reason to get rid of him. Mr. Sealy, what was the retaliation for specifically? Well, there were numerous protected activities. They essentially start in February of 2019 when he had made two main protected activities. The first was he had made a complaint about the N-word being used in his direction to Osorio, the human resources manager. And he had also formally requested leave under the FMLA in a number of different ways. He continued to complain throughout his employment about the retaliation that he suffered thereafter. And he had also filed a charge of discrimination as well as a formal complaint in the Eastern District of Pennsylvania, which they were both aware of. Against his boss? I'm sorry, could you repeat that? What was the complaint against? So the complaint was against his boss and Osorio. I believe that they were both specifically named, but I know for sure that at very least Osorio was specifically named in both the charge and in the actual lawsuit itself. And I think it's relevant here that she is also in a romantic relationship with the boss, John Grassi, as well. OK. So essentially, following those initial protected activities in 2019, Osorio first directly displayed animosity towards his request for FMLA leave itself. She had refused doctor's notes that he had provided and assessed him points for leave taken for his conditions, which actually resulted in him pursuing the FMLA formally. He was never given paperwork or notice of his rights on the FMLA as required. She actually refused to provide the forms that he actually specifically requested from her, saying that she wanted to utilize her point system instead. She then refused to accept the completed forms that he had tried to provide her and even sort of boasted that she had never truly approved his leave under the FMLA, that she had complained to the Grassi's about it and that she would never respond when he would actually utilize his leave under the FMLA. Thereafter, for the next five to six months, he continuously experienced repeated animosity until his separation. He testified it was constant, constant harassment. Every time he would utilize FMLA leave, he would be harassed upon his return and was met with trouble and inattitude. He would constantly be called into the office by Osorio, who would talk down to him and talk nasty to him. Osorio would belittle him, be belligerent to him every time she saw him. Every time he would return from leave, Beck, one of his supervisors, would make comments to him such as, well, we really needed you yesterday. Why did you take off? And similarly, his other supervisor, Thompson, would make comments such as, why did you take off, and always give him an attitude and a problem when he would return. Also, every time he took off, when he would return, Beck and Thompson would both avoid giving him work orders that were necessary to complete his work, leaving him sort of scrambling to determine what type of work needed to be done. Can you fast forward a little bit to the cell phone and the solicitation of prostitutes? Because I think that's where the parties seemed to join the fight. Absolutely. So following all of the animosity that he had experienced throughout his employment, Osorio essentially cuts the lock off of Mr. Canada's personal locker that was used only by him while he was on vacation, took out his personal fax, searched his personal password protected cell phone, and searched through his text messages, which they claim ultimately compared to his timesheets, which led to his ultimate separation. Mr. Seiler, you mentioned personal locker. I didn't get that impression from what I read. In other words, this locker was specifically assigned to him. Is that your view of the case? Mr. Seiler? It makes a claim that numerous Mr. Canada's locker, he was the only person that used during this time frame, and even Osorio herself admitted that he was the only person who would have been using that locker during that time frame. She named a different locker in the defendant's locker room. So it was well known at the facility that he was the only individual who was actually using that locker and had his own personal locker on him. But it was the company locker, as I understand it. It was a company locker, not his personal locker. He had his personal lock on it in violation of company policy. Is that accurate? It is on company premises. There are some allegations that those lockers were actually brought in by employees of the company and not purchased by the company itself. But I don't know that we're going to create a dispute over who actually owns the locker physically. I think the more important aspect is the fact that it was always used by Mr. Canada for some time. He maintained his own personal lock on it, which would show the intent from a defendant to specifically go into only his locker and search only his specific locker. How heavy, with the contents in it, if you know, and if it's in the record, how heavy was the locker? I don't know that the actual weight of the locker is in the record. Um, there were allegations that the locker would not have to be opened in order to be moved. And that was actually that's what I'm trying to get at. Yeah. So back, Mr. Canada supervisor testified in the case that the locker wouldn't have to be moved in order to remove anything from it from it. They're in. And he also testified that their permanent fixtures, which, you know, I take that the locker cannot be moved. Um, they claim that the locker was moved by based on that testimony. I would say that there's at least a factual dispute as to whether the locker ever needs to be open in the first place, to the extent that there even was a reason to move the locker in the first place. Oh, your, your view is that they knew it was a locker that was used almost exclusively by Mr. Canada when they decided to get inside of it because it was a lot. That's exactly right. And, you know, as I stated previously, a Surya essentially admitted that she was aware that he was the only person who would actually be using that locker. It was well known within the facility. Again, we have another third party witness who specifically testified that it was well known that Mr. Canada was the only person who was using that locker and it was his lock that was on. It was all of his own personal effects. In fact, it was his personal cell phone with a protected lock on it. That was actually searched. So what do you make of the company's argument that they had the right to search the cell phone because it's a Samsung cell phone and they wanted to make sure that it was being appropriately used? So there are, frankly, just especially after months of consistent animosity against Mr. Canada, there are simply just too many question marks as it pertains to the propriety to search in the first place. There's so many instances that must have occurred for this to be an appropriate search in the first place. And for her to just randomly see a cell phone in the locker, which there was questions as to why the lock was even searched in the first place and contradictions in that regard, for them to simply just see a Samsung cell phone, just randomly assume for no other reason other than the fact that it's, quote, a Samsung, that it was a company phone. It just it's a bit of a bizarre reason to then go into it and search the text messages therein to determine whether it was a company cell phone. And this is also by Osorio, who's the individual who actually maintains company phone lists. And she's also the person who actually passes out company cell phones, which are not ever passed out to people in his position. They're always passed out to members of management. I'm not aware of any report of a missing phone. There's just so many irregularities that surround it that make it just highly suspicious under the circumstances. What do you make of her taking pictures of the FMLA books? I think that just everything in this case just compounds upon each each other piece of evidence here. And the fact that she didn't take pictures of every other piece of clothing or any other personal effects, the food and water that he had in his locker, but specifically took pictures of just the text messages and specifically his FMLA books, especially when you compare it to her reaction to his FMLA requests in the first place, as well as during her deposition that she basically had never formally approved him and that she complained about FMLA. I think it just all compounds to show that she had a specific act to grind about the fact that he was taking FMLA and that she had to just abide by it because he specifically told her this is federal law and you have to do this. Your argument, Mr. Seidler, so far is that your client is getting set up by Ms. Osorio. Is that fairly accurate? I'd say that's fairly accurate. I think that I would characterize it as though they took advantage of an opportunity while he was on vacation to go snooping and to go find a reason for a separation. And what's a better place to find something against him than his locker, a locked locker and a locked cell phone and text messages therein that have no relation to the company or any of their intent, claimed intent to search. So if that phone wasn't there, you had no case. Well, I'd say if that phone was never there, they would have no reason for separation at all. I'd say that we don't dispute that they have at least a claimed legitimate reason for separation. But I would say that all of this together, all of the consistent animosity, he even complained to Beck, which Beck admits prior to his separation that he was being harassed and that he said she's going to fire him. And then that's exactly what happened. But it seems to me that your case is built on this phone that she opened and saw what apparently were, I guess he was pornographic material. I'm not sure what it was, but there was something offensive there to her, at least. Your case is built on that. So I would say that our case is built on a collection of all of the evidence in the case in its totality and not just the phone itself, but also the significant, I mean, the significant animosity that he received only from his protective activities and that increased until his separation. I think that that is a huge part of this case that certainly has to be considered in that Third Circuit case law specifically says can establish pretext. Are you only pursuing retaliation right now? We are only pursuing retaliation as to each of his claims. Yes, Your Honor. How did she get the password? Did she just get a lucky guess? The password 1234 or something like that? It was actually a pattern protected password, and she does claim that it was a lucky guess that she actually received this. Now, the belief is that they actually took the cell phone and went to actually have it opened by somebody to figure out the lock to actually access it. But there's just there's not enough evidence for me to actually put that formally in a but the fact that she did just have a lucky guess on a password protected cell phone is I think that that's highly suspicious, to say the least. Okay, and do you have any time for rebuttal? I did reserve three minutes for a vote. Okay, okay, good. Why don't we hear from Mr. Kushner then? Thank you, Your Honors.  Good afternoon, Your Honors, and may it please the court. My name is Brad Kushner, and I represent the Appellee Samuel Grazi and Sons, which I'll refer to as Grazi. This appeal, Your Honors, is about whether a private employer is prohibited from discharging an employee who undisputedly engages in criminal conduct. It is not about that at all, Mr. Kushner. The appeal is about whether or not they manufactured a pretext to come up with a reason, a justifiable reason, to fire him. Mr. Seiler is not disputing the fact that once they got into the phone, but they found violated the company policy and their grounds to fire him. His argument is that the search of the phone was a pretext. Basically, they were trying to get rid of the guy, and they went about trying to get any evidence they could to come up with a reason to fire him, and they got lucky, and they found a reason to fire him, and they fired him. But they only fired him to retaliate against, up until the time they had grounds to fire the guy. It was all basically retaliatory for his exercise of FMLA and Title VII rights. I understand that, Your Honor. There's some evidentiary issues with that argument, and there's also some practical issues. What is the evidentiary problem? We agree that there was a search of his locker. There's an issue about whether or not it's a private locker or a company locker, apparently. It's undisputed that they cut the locker open. It's undisputed that they searched the phone. The reason purportedly for searching the phone is to find out whether or not it's a company phone. That's laughable on its face. You don't search for text messages to find out whether or not it's a company phone. You go to the model number, the serial number, and you check the serial number against your records. That's ridiculous. So there's an issue of fact. And she got lucky in searching the phone. She found these text messages, which then gave rise to a motive, a legitimate reason to fire her. But beyond that, am I missing something? Your Honor, let me say this. If the company wanted to terminate him, Mr. Seiler just said, what's a better place to find evidence of wrongdoing against him? I would argue that the best place would be in his personal locker, in the company locker room. He had a personal locker. That's not what we're talking about here. This was a shared tool compartment. And respectfully, Your Honor, there's not an issue of fact as to whether this was his locker. This is a shared tool. Isn't there testimony that this is the only time a locker like this that was bolted to the ground was cut open by the company? There's a lot of disputed testimony in this case, isn't there? Your Honor, the testimony from everyone except for Mr. Canada is that this occurred before. Mr. Canada, I'm sorry, and one of his witnesses testified that they were not aware of this happening. Mr. Beck, right? That's correct. Who's a company employee, right? That's correct. So it's not just Canada. No, Mr. Canada and Mr. Lagone, who's another rank and file employee, said that they weren't aware of this happening. But there's, I mean, a concern I have is that it looks to me that the district court interpreted all factual disputes in the defendant's favor, as opposed to the plaintiff's favor in summary judgment. Well, Your Honor, respectfully, I don't think there are many factual disputes because this entire theory is based on inferences and speculation. The, so first of all, it wasn't the company who cut the lock. The company asked employees to move the locker because it had been moved and was blocking some cameras. The employees, they decided to move, in order to move the locker, they had to remove the items inside because these tool compartments contain company tools. So I believe it was Judge McKee just asked about the weight, but the issue wasn't that it was too heavy because they're moved with cranes.  when they moved this locker. Did you just say the company didn't move it? The company's employees moved it? That's correct. How do we understand the difference? So this was other rank and file employees. I believe they were material handlers, just like Mr. Canada. And they just came up one day and said, why don't we move that locker? Or did someone instruct them to move the locker? Somebody did instruct them to move the locker. So the company moved the locker. Right, right. But it was, but they didn't instruct them to cut the lock and they didn't instruct them to take the phone out. They didn't instruct them to give the phone to company management. Who decided that? That was the employees because they wanted to take the, they wanted to take out what they assumed were company tools before they moved this big locker and possibly using a crane and possibly damaged company tools. How big was this locker? My understanding, Your Honor, is I don't want to misrepresent because I'm not certain. My understanding is it's probably somewhere around six by six, eight by eight, something like that. And it's bolted to the floor? No. It's not bolted to the floor, okay. I don't believe so. It's heavy. They're made of steel. And if they're moved, they're moved with the cranes that are on the company floor. If it's heavy, it has to be moved with cranes. Does it matter? You're saying they're going to take the tools out so they wouldn't damage the tools. What kind of tool in there would possibly be damaged by it being moved? Were these very sensitive measuring gauges or were these things like bolt clippers and vices and pliers and hammers and the kind of stuff I'd find if I walked out into my garage? Well, it's a steel fabricator, Your Honor. So I'm not exceedingly familiar with the type of tools that they use. But these tool compartments are located in each area of the shop floor. And that's why they're there for the employees to use the company's tools, but the tools are maintained in these tool lockers. So the testimony is that the employees removed the items. Nobody instructed them to cut off this lock. The only testimony that the company would have any idea that Mr. Canada was the primary one who used this was from Mr. Canada himself. And I think there was some ambiguous testimony. When did they find that out? They found that out when these employees began removing the items from the locker, because when they opened it, there were some clothes in there and then they found this phone and that's when Ms. Sorio was there. And then the phone was the exact type of phone that's given out to- It was a Samsung. What are the chances of her guessing? What are the chances of giving somebody a cell phone and saying unlock it in one try? What are the chances of that happening? I don't know, Your Honor, but there's no evidence that that's not what happened. Well, it's nine times nine times nine times nine, assuming it's a four digit. Let's assume it's only a four digit password. It could be a lot more than that. As I understand it, Your Honor, it's a finger, you drag your finger. So infinite possibilities. So infinite possibilities of what that pattern could be. Right, I mean, again, this is speculation, but it's just as easy to assume that there was no password and that Mr. Canada is just claiming there was a password. But if you speculate, don't you speculate in favor of the plaintiff? If it's a warranted speculation, if there's, I mean, if we're just guessing one way or the other and there's no evidence. Well, didn't he allege that there was a password? There was password protected. I'm sorry, Your Honor. I thought there was an allegation here that was password protected. That's correct. He does allege that. So, I mean, that's if you're saying there was password protected and they got in, that's fine. There's no evidence that there was anything nefarious or that they had somebody, you know, what Mr. Siler just suggested was, again, pure speculation. He's casting aspersions on what the company did based on no evidence whatsoever, that they somehow used improper means to get into his phone. There's no evidence of that in the record. Well, but there's an allegation that it was password protected and they got into the phone. We can assume they didn't get into the phone by locating him on vacation and asking him what his password was. They somehow got into the phone. Again, it's summary judgment. These are all arguments, the arguments that you're making are great arguments to make to a jury and they might find them pretty persuasive. But at summary judgment, it seems to me we have a scenario which is where I laid out to you earlier that they had noticed that he'd filed these complaints against the company. He'd gotten some grief for having filed them. He's on vacation, they search his locker and apparently nobody else's locker. They find his phone. They go into his text messages and the explanation is we went into the text messages to find out whether or not it was a company phone. That, I'll tell you, if you make that argument to a jury, I'd like to have a nickel for every juror that doesn't laugh when you make the argument, make it a dollar. It's just a ridiculous explanation as to why they went into the text messages. And so even if we didn't have to grant the inferences in favor of the non-movement here, it seemed to me that the inferences that they went into his messages to find out if they could get something to pin on him to fire him. Why else would they go into text messages? Well, your honor, the testimony is that they looked in the phone to find out whose phone it was. And the very first- And it's a flat out lie, Mr. Kushner. That's not why you look at it. This is my phone, all right? Now, if I wanted to find out if this was a court phone or not, what I would do is I would go to Inf General and I would come down to About and I would look at the model name and the model number and the serial number. That, you can't see it very clearly. That serial number there, it's going to tell me whether or not that's a court phone or a Ted McKee phone, not the text messages in here. Although I guess if they find all the messages about the Cleveland Browns, they'll know it's probably mine. Well, I mean, I would say even if they didn't, I mean, just to find out whose phone it was, even if it wasn't to find out if it was a company phone- Well, it's his locker, right? It wasn't, that's the problem, your honor. It was a company tool compartment. There's no evidence that this was his locker. This was a shared employee tool locker and the undisputed evidence in the record is this was a shared employee tool compartment. Shared employees did he share it with? Yeah, who did he share it with? On the record? All the employees on the floor, on the shop floor. He placed his own lock on there, which the company discovered when all this happened, but he wasn't permitted to do that. There's no evidence that the company was aware that he had done that. We now know why he placed the lock on there because obviously he had something in the locker that he didn't want getting out there. Do you know how long his lock was on the locker? We don't know that, your honor. Only Mr. Canada would know that. But from your perspective, it was a shared locker. That's correct. But it couldn't really be shared if his lock was on it, right? Presumably. For all we know, he may have placed the lock on there when he left for vacation. He was on vacation when this happened. We just don't know because it's not... I mean, the company has no reason to look and see who's using particular tool compartments. They had no reason to know that there was a lock on this particular tool compartment until the employees cut the lock to move the tool compartment to a different area so it wasn't blocking the camera. Do you know how many lockers were in this particular room? It's one locker for each area of the shop floor. This was the only area for that room or section of the shop. Then each section has its own tool compartment. I see. Basically one locker in that room. That's correct. That's correct. Now, again, there is a separate employee locker room and Mr. Canada did have his own private locker in a locker room where he stored personal effects. When he came to work, when he got changed, he would put his lunch in there, he would put his clothes in there, things like that. And that's not what we're talking about here. And it would seem that if Grozny was looking for a reason, wanted to look for some reason to terminate him, to justify his termination, that that's where they would have gone, not to look in this tool compartment. They would have no reason to know that would specifically be his phone in there. And then there's a causation. If I may, I see that I don't see if there's a... Do I still have time for honors? Patrick, I think last note I got at 12.45 was that you had five minutes. So, yes. Okay. I would also add that there's a causation problem here because under the Supreme Court's 2013 decision in Southwest... University of Texas Southwest Medical Center v. Nassar, which is 570, United States Reporter 388, retaliation claims need to be proven pursuant to traditional principles of but-for causation, meaning that but for the employee's protected activity, he would not have been terminated. And here, Mr. Canada doesn't argue that solicitation of prostitutes isn't a terminable offense, or that Grazi doesn't typically terminate employees who do this. No, what he's arguing is they don't typically search properly like this. And but for his complaint, you wouldn't have gone into a cell phone. That's what he's arguing. Perhaps, but we would argue that that's not the... I don't think it's a search, Your Honor. It was discovered. But to the extent we want to use the term... It was discovered in a search. It was discovered because it was a search. Okay. We didn't just fall from the heavens. No, these employees handed the management the phone and said this phone was in this locker, and then they saw it. So let's say that the looking through the phone is the alleged retaliatory action. But we say the employees handed them the phone. Yes. Specifically, Ms. Orosa, whatever her name is, is the one who went into the phone. That's correct. Did she see the phone when it was in the locker or was taken out of the locker and given to her? My understanding from her testimony is that Mr. Kennedy's co-workers were removing the items. By that point, she was there because they had let them know that there was a lock on the locker and it had to be cut open. So she was standing there. What is her title? She's the director of HR. Why would she be there when they cut out a... She just happened to be passing by? Why would she be called in? Okay. But so the actual looking through the phone would not necessarily be materially adverse under the NASSAR standard because there's no... The standard is whether it would likely dissuade a reasonable employee from engaging in protected activity. Mr. Kennedy wasn't there. If not for his illegal conduct, he would have no reason to know that they looked in the phone. So it's unclear how simply looking in the phone would dissuade a reasonable employee from engaging in protected activity. And I would also add that up until this appeal, Your Honor, Mr. Kennedy focused solely on his termination as the retaliatory action here, both in the pleadings of the amended complaint as well as in the summary judgment motion. So it wasn't until this appeal that he sort of shifted the focus from the actual termination to the process that led to... Well, that's an important point. That's a very important point. We're saying that during the district court, he never argued that the retaliation was the search. That's correct. I know I had under paragraph 40 of the complaint and now he argued that what led to the search was it's a similar argument, but the retaliatory action, the adverse action was his termination, not the scrolling through the phone. What was the initial purpose for breaking that lock open in the locker? So again, Mr. Kennedy didn't depose any of the employees who were involved in that. And obviously if the company's explanation were false, they would be the best ones to disprove it. He didn't take any of their depositions. So we don't have... I mean, they were the ones who decided to remove the lock in order... But as we understand, it's probably hearsay, but the only testimony is that it would have been to remove the company's tools that they expected to be in there before they lifted the locker to move it. Because anytime one of those lockers is moved, they remove the company tools so that they're not damaged. Is that right? That's the company policy? This is a locker that may have company tools and therefore we can get in there and to get in there, we have to break the lock? I don't know that it's a written policy, Your Honor, but it's certainly the practice. There was testimony that that's the practice. If it's a company locker and a company use locker, wouldn't the company have the combination to the locker? There aren't locks on the tool lockers, Your Honor, typically. That's the issue here, is that Mr. Cannon went and put his own lock on this locker. So then when they discovered that, they weren't able to move the locker. So they had to cut the lock to remove the items. And obviously, we now know why he put a lock on the locker. But, you know, to accept Mr. Cannon's argument, you need to just stack inference upon speculation and these aren't warranted inferences, you know, based on the evidence of record. He argues that there's animosity, but there's no animosity that has anything to do with his protected activity, with his termination, or even with the individuals  There's a good bit of evidence that there's animosity, there's a good bit of testimony from Canada about some real serious disagreements with Ocasio and the way she handled his FMLA complaints, right? There is testimony that when he first requested FMLA leave, she was unclear on what was needed or what was required under the FMLA. And that, you know, upon investigation or upon explanation, she said, okay, that's fine. And he took leave and there was never an issue. You know, I'm thinking, and I'm thinking about this thing about the cell phone. And I was listening to Judge McKinsey how the chances of her being able to open that phone are really phenomenally low. But if I came upon a locker like that and there was a cell phone in there, why would I want to break it open? Why, not break it open, but why would I be compelled to find out whose phone was that? Why not just put it back in the locker? Mr. Osorio's testimony was that this was a, again, this was a company tool compartment to when they found personal belongings in there and there was no way to know, you know, just from looking whose personal belongings they were. Well, I didn't assume it's a company phone. If they give out Androids, they find an Android, why would they assume that that's a personal phone?  according to at least Mr. Salazar's presentation, he was not high enough on the employment totem to have been given a cell phone. That's true, Your Honor. And that's the point, is that they didn't know that it was his phone. They just knew that there was what appeared to be a company phone in the locker and they needed to find out whose it was. Why? If it was a company phone in the locker, all they had to do, one, I wouldn't imagine this phone was so heavy, they had to remove the phone in order to facilitate moving the locker. I'm really at a loss of that. There's so much smoke surrounding this episode. I just don't understand. I understand your argument, but it doesn't make a lot of sense to me. My understanding from the testimony, Your Honor, is that they removed the item, and they found personal items in what was a company tool compartment. A, they needed to find out whose items they were, and B, she thought it was a company phone and assumed that by looking in the phone, which she assumed to be a company phone, she would be able to identify whose items were in this tool compartment. And that's why it was open. It wasn't a situation where she, I'm sorry. To find out whose phone it was, she goes rambling through text messages rather than looking at the serial number of the phone. She wasn't asked, I don't know whether or not she looked at the serial number, but when the phone was open- Either way, you got a problem. If she looked at the serial number, no reason to look at the text messages. If she looked at the text messages, why in the world isn't she looking at the serial number? Either way, there's a problem. My understanding is that as soon as the phone is open, you- They were able to see what had been happening. What had been happening? What led- What that he had been soliciting these prostitutes. And then there's timestamps. And based on that, they looked further. And by the time they realized whose phone it was, which required them to scroll through many, many, many text messages and pictures, and they eventually got to a picture that had him. But that's, I mean, they already seen the evidence and it was clear that this was being done at work. And it's just sort of- Doesn't Osorio's testimony when she says, I opened on the first try, automatically create huge issues of credibility? I don't, I don't know. I mean, I don't know that she said, I opened it on the first try. She said that there's a sort of standard for these type of phones. There's the same finger pattern that everybody uses. And that when she tried it, that was there. I don't know that there's a, I mean, there's a credibility. I mean, I don't know. I don't know that that in itself creates a credibility issue if there's no evidence to dispute it. Judge Frontier, did you have anything else? No. Okay, Mr. Satter, you still have some time. Thank you. Thank you, your honors. I just wanted to clear up just a few major points here. There was a lot of testimony about the fact that there is no dispute that this is a shared locker. Osorio specifically testified during her deposition, nobody else works in that area. Keith Mobley, the person who works at nighttime, puts always his stuff in his locker in the locker room. And then I asked, so he's the only person who would have had things in that locker? And she said, I believe so. And that was asked because, why would you ask Mr. Candida to move the locker if you didn't know the locker was his in the first place? Counsel argued, as I understood it, that you didn't pursue, you didn't necessarily pursue these claims in the district court, is that true? No, so I think that there's a misconception. We're not claiming that the search of his phone by itself is the adverse action here, which I think is the point that defense counsel was making. We're claiming that the termination, which was the result of all of this, and the nefarious intent was the adverse action, which we've been pleading since day one in the complaint. You got two things you said, and one of them would be okay, the other one wouldn't be okay. The termination would be okay. The intent, I know Mr. Kushner takes issue with that and says that the intents are relevant if there's a genuine reason to terminate him. But at least your best case, I guess, is Hopgood out of the Seventh Circuit, where the intent would be very relevant. I would say that the intent, I mean, even on a Third Circuit law, the intent is huge when you can prove pretext by whether or not discrimination was more likely than not the actual reason for the termination. So I think intent is really everything in a discrimination case, if they had an intent to discriminate. The problem though here is that you've got a situation where the company had grounds to terminate. This is a clear violation of company policy, no one's arguing, no one's disputing that. It's more subtle than that, and that is, can they rely upon what you would call a discriminatory and retaliatory intent to find evidence, which would then give rise to a legitimate reason to terminate? We don't have any cases, at least not that I'm aware of, that address that question. Hopgood addressed it. There's some district court cases, one out of Alabama, one out of Puerto Rico, that might be a circuit case, that addresses the Cerullo, Cervantes case. That's Cerullo, I guess. We don't have any cases that address it. I don't disagree with that premise as far as whether a witch hunt can result in a showing of pretext, which is a big part of this case. I would say that we don't have any case all directly on point, but all the cases that you cited, I think are strong, persuasive argumentation in that regard. We don't necessarily need to rely fully on that here. I mean, there is precedent from EZLD within the Third Circuit from 1992 that says improving the employer's motive was more likely than not the product of discriminatory reason instead of the articulated legitimate reason, sufficiently strong evidence of an employer's past treatment of a plaintiff may suffice. So- Yeah, but EZLD is very, very, very different. Very aware of EZLD, that's not a law firm. EZLD does not present the question the way this case presents it in terms of legitimate grounds for firing. There, there was an argument that there was a series of trumped up performance evaluations to get rid of this woman so they wouldn't have to make her a partner. But the evaluations themselves, the argument was, were biased by the fact of her gender. Here, there's no argument that the grounds for which they fired him were invalid. They were valid and you can see that. It's more subtle. And that is, can they come, can they find, almost stumble into a valid reason to dismiss somebody when the only reason that they're stumbling down that path is they're looking for some way to retaliate against this guy who's been a pain in their ass because he's filing these complaints? I think that's a wrong question. I don't disagree with you. I think that the motive here is really everything, which is shown both by how they claim to have found it in the first place, which is highly suspicious, which is also betrayed by all the animosity that he had experienced since engaging in protected activities. So I think that there's not only enough to show the obvious motive here, but also a lot of questions around the legitimacy of it in the first place, which goes to show the witch hunt, which obviously relates back to the case law that you're referring to. The only other point that I wanted to bring up, which is also just a factual question, just to make sure that this is clear for the record, as to whether there were rank and file employees who had just needed to move the locker, and then they gave this all to Osorio, who then saw a cell phone. This is another major point of contention here, because again, Osorio specifically testified talking about John Grassi. This is a quote. He told me he wanted that locker removed from that area from blocking the camera. So when we went down to the shop, I told him, I said, there's a lock on it. He's like, well, just cut it and remove the locker. So there is no, I mean, that is Osorio's own testimony that she specifically went and had the lock cut off of the locker to have everything removed. And she said that he placed everything into a trash bag and then, you know, did what they did with the cell phone. So this is even more than just, you know, a factual dispute. It's their own, you know, employer testimony as well. But you didn't get the positions of the employees who actually went into the locker? I don't believe that they're listed on the initial disclosures. And realistically, it's so clear to me that Osorio was the initiator, Osorio and or John, he disputes that he ever told her this. And she claims that he did. One of them was the person who decided to actually initiate cutting the lock off of the locker and going through the locker. So whether there was somebody with her at the time of the cutting of the locker or not, I don't necessarily see as being a material part. Mr. Kushner is saying that she didn't cut the locker, that employees cut the locker off. And according to his presentation, they independently did it because they knew the locker had to be moved. And the director of HR just happened upon the scene, apparently, which is kind of fortuitous since that's the person you'd want involved if you're trying to find a reason to fire somebody because she just happens upon the scene. So all around, this is Grassy's lucky day. Head of HR is there when they search the locker. They just happened to luck out and get past the password. They just happened to find the text messages with the prostitutes on there. And they really lucked out that day. And I don't disagree with you, Your Honor. And that's their contention. And their own witnesses even dispute their own contention in that regard because Osorio says that they actually went with the intent to cut the lock off the locker. It was not a matter of employees coming up with this idea on their own and then giving her what was in it. She says that John Grassy told her to go cut the lock off the locker and remove the things. Was there other lockers in that room that were moved? Other lockers in the same room that were moved? So this locker was on the shop floor, which was by his workstation. So it's my understanding that there are other lockers that are on the shop floor, but from my understanding, there was only one locker that was specifically there, but it was known to only be used by Mr. Kane. Okay, we don't have any other questions. Could you cut the live stream and let's just have a brief conversation with Mr. Seiler and Mr. Kushner. Yes, give me one moment.